Paul BAKER, Southeastern, Inc., Eastland, Inc., Triple "S" Operating Co., Sanditen Investments, Ltd., and Admiral Square, Incorporated, Appellants,

v.

PUBLIC SERVICE COMPANY OF OKLAHOMA, the Corporation Commission of the State of Oklahoma, and the State of Oklahoma, Appellees.

No. 48268.

Supreme Court of Oklahoma.

Jan. 29, 1980.

McPherson & Buckingham by John C. Buckingham, Oklahoma City, for appellants.

Robert L. Lawrence and Everett L. Cunningham, Tulsa, for appellees.

BARNES, Justice:

This is an appeal from an Order of the Corporation Commission. The parties are in agreement on the facts. The Appellants, Paul Baker, Southeastern, Inc., Eastland, Inc., Triple "S" Operating Co., Sanditen Investments, Ltd., and Admiral Square, Incorporated, will be collectively referred to as Appellants. Appellee, Public Service Company of Oklahoma, will be referred to as PSO.

Appellants filed an Amendment Application before the Commission requesting an exception to Rule 11 of the General Rules and Regulations governing the operation of electric public utilities and an order permitting them to continue selling electric service to tenants of their shopping centers as an ancillary service to the operation of their shopping centers located in Tulsa and Bartlesville. Appellants' testimony indicated that in the building of their shopping centers, it was necessary to demonstrate an ability to provide electric service before they could obtain the necessary financing for construction. Such service was, and is, being provided to the tenants, but is not being furnished to the general public.

The testimony further indicated that PSO did not desire to install an electrical distribution system in any of the shopping centers, and desired to serve by contract rather than by existing tariffs approved by the Commission. The record is not clear as to who designed the systems or whether PSO raised objections as to the methods of installation used. The electric facilities were designed to serve only the tenants of the shopping centers, and, after the facilities were constructed, contracts were entered into between Appellants and PSO for the furnishing of electrical current. The necessary contracts were filed with the Commission.

Thereafter, on July 1, 1974, the Commission issued Order No. 104932 in Cause CD No. 24963, which provided, in part, as follows:

"Rule 11:

"(b) No utility shall sell power or energy to any consumer for resale under Commission jurisdiction pursuant to a tariff providing for resale unless the Commission had been advised fifteen days prior to commencement of deliveries. *No such sale shall be made unless the purchaser from the Utility has tariffs on file with and approved by the Commission, rate schedules, rules and regulations, covering such resale, or is exempt by law from such requirements.*" [Emphasis added]

The Order also provided as follows:

"Rule 5:

"(c) A special contract or agreement other than a filed tariff under which electric service is furnished to a consumer shall be deemed a tariff for the purpose for which approved and for the purposes of these rules. *No special contract for electric service shall become effective until it has been filed with and approved by Order of the Commission, after notice and hearing when directed by the Commission.*" [Emphasis added]

The Commission's adoption of Order No. 104932 precipitated the filing of an application by Appellants before the Commission seeking relief from the enforcement of the Order.

Following a hearing, the Commission entered an Order denying relief to Appellants. That Order denying relief (Order No. 110944) provided as follows:

"IT IS THEREFORE ORDERED that the application of Paul Baker, Southeastern Inc., Eastland Inc., Triple 'S' Operating Company, and Sanditen Investments, Ltd. for an exception to Rule 11, be, and the same is hereby denied.

"IT IS FURTHER ORDERED, that consistent with the parties' mutual agreements as embodied in their contracts, the electrical distribution systems *be sold to PSO for an amount to be agreed upon by the parties, consistent with their mutual contracts.*

"IT IS FURTHER ORDERED, that PSO shall not discontinue service to any of its shopping centers involved prior to the sale of their facilities, without specific order of the Commission.

"IT IS FURTHER ORDERED, that this cause be set for additional hearing before the Commission, en banc . . . *for mediation and settlement of this proceeding in the event that the parties cannot mutually agree to a specific dollar figure for the sale of the electrical distribution facilities involved ninety (90) days of the date of this Order.*" [Emphasis added]

Appellants appeal from this Order denying relief. The hearing scheduled before the Commission has been, by agreement of the parties, held in abeyance, pending the outcome of this appeal.

On appeal, it was stipulated that the testimony of Mr. Jim Wells, owner of several of the shopping centers, would be substantially the same as that of the other shopping center owners if they were called to testify. Wells testified that (1) the electric distribution systems were in the original plans and specifications for the shopping centers and were designed by PSO; (2) that the electricity is purchased from PSO and then resold to the tenants of the shopping centers; and (3) that the income derived from the sale of electricity in the Southeastern Village shopping center represented only a small amount of the total income (7%) derived from such shopping centers' services. It was agreed by all parties that a substantial investment was made by the parties who built the electrical distribution systems. With respect to all of the shopping centers of Appellants, there is no dispute that the electrical distribution systems were contracted for and built and were serving the shopping center tenants with the approval of the Commission prior to the Commission's promulgation of Order No. 104932 and Order No. 110944.

## I.

Under their first proposition of error, Appellants contend that the ancillary and private activity of supplying electric power to their shopping centers tenants does not convert their businesses into public utilities, thereby subjecting them to the regulation of the Commission. In support of this position, Appellants rely on 17 O.S.1971, § 151, which defines a public utility as follows:

"The term 'Public Utility' as used in Sections 151 through 155 of this title, shall be taken to mean and include every corporation, association, company, individuals, their trustees, lessees, or receivers, successors or assigns, except as hereinafter provided, and except cities, towns, or other bodies politic, that now or hereafter may own, operate, or manage any plant or equipment, or any part thereof, directly or indirectly, *for public use*, or may supply any commodity to be furnished *to the public*.

"(a) * * *

"(b) * * *

"(c) For the production, transmission, delivery or furnishing electric current for light, heat or power." [Emphasis added]

■ Appellants submit that their business of supplying electricity to their shopping center tenants does not involve a "public use" within the meaning of the above statute.

Appellants also argue that a landlord who maintains a utility facility for his tenants, and makes a specific charge for such facility based upon the volume of use by the tenant, is not operating a "public utility". Finding no Oklahoma law directly in point, Appellants rely on a number of cases from other jurisdictions indicating such an entity is not a public utility. These cases conclude that whether a landlord is a utility is determined by looking to the class of people served and to the design of the physical facilities.

In *Drexelbrook Associates v. Pennsylvania Public Utilities Commission, 418 Pa. 430, 212 A.2d 237 (1965)*, Drexelbrook Associates, a limited partnership, owned and managed a garden-type apartment village with nine-ty buildings, containing 1,223 residential units, 9 retail stores, various public areas, and a club with a dining room, swimming pool, skating rink, and tennis courts. It was proposed that electricity and other utility service would be supplied to the owners at a single delivery point, and the owners in turn would have their own distribution system to the various tenants, submeter electricity to them, and collect for the volumes used. The question presented was whether the service the limited partnership proposed to furnish its tenants would be service to or for the public under a statute similar to 17 O.S.1971, § 151, supra.

In that case, the Pennsylvania Supreme Court reversed the Pennsylvania Public Service Commission, holding that the landlords were not operating public utilities, as the service provided was not "to or for the public." In so ruling, the Court stated:

" * * * In the present case the only persons who would be entitled to and who would receive service are those who have entered into or will enter into a landlord-tenant relationship with appellant. . . [T]hose to be serviced consist only of a special class of persons—those to be selected as tenants—and not a class open to the indefinite public. Such persons clearly constitute a defined, privileged and limited group and the proposed service to them would be private in nature."

Also see *Sierra Pacific Power Company v. Nye, 80 Nev. 88, 389 P.2d 387 (1964)*, in which the Court indicated that a trailer park operator purchasing and reselling electricity to his tenants was not a public utility.

In its brief in chief, PSO made no attempt to refute any of the cases cited above. Rather, PSO contends that the Commission's jurisdiction over PSO's activities justifies the Order.

In so arguing, PSO relies on *Campo Corporation v. Fineburg, 279 App.Div. 302, 110 N.Y.S.2d 250 (S.Ct. N.Y., App.Div.1952)*, and *Boston Real Estate Board v. Massachusetts Department of Public Utilities, 334 Mass. 477, 136 N.E.2d 243 (S. Judicial Ct. of Mass. 1956)*.

*Campo, supra,* involved a review of an order of the Public Service Commission which authorized the Respondent, Consolidated Edison Company of New York, Inc., to cease selling electric current to landlords for the purpose of resale to residential tenants, a practice commonly called submetering.

In that case, the Court held that although the State Commission had broad powers to regulate corporations that sell electricity "to the public", the Commission had no jurisdiction over the activities of submeterers. The Court then went on to hold that the State Commission could, nevertheless, protect the sale of power by public utilities to those who sought to submeter.

In the *Boston Real Estate Board case, supra,* the Court ordered Edison, the public utility, to cease selling electric current for resale without approval from the Department of Utilities.

Based on the foregoing authorities, we hold that Appellants are *not* "public utilities", as that term is used in 17 O.S.1971, § 151. In so holding, we note that it has been consistently found (even in the *Campo case, supra,* relied upon by PSO) that landlords who only submeter electricity to their tenants are not public utilities.[1]

■ The determination that the Appellants are not "public utilities" does not totally dispose of the matter before us, for although the Appellants were not subject to direct control of the Corporation Commission, that does not mean that indirect control of their activities may not be proper. In the case before us, Appellants went to the Corporation Commission seeking an exception from the application of Order No. 104932, which would permit them to continue their practice of submetering. Order No. 104932 requires, in essence, that no utility sell power for resale (for submarketing purposes) unless certain conditions are met, one of which is that no such sale shall be made unless the purchaser from the utility has tariffs on file with, and approved by, the Commission, rate schedules, rules and regulations, covering such resale, or is exempt by law from such requirements. Such requirements, which are controls over PSO's activities, are within the Commission's jurisdiction and may be enforced without requiring action against the Appellants. Thus, the Commission's refusal to grant an exception was within its jurisdictional power.

## II.

■ In addition to the jurisdictional attack, Appellants also argue that the Commission's Order denying them an exception impaired vested contract rights, and thus violated their constitutional rights. We do not agree with Appellants' analysis. We hold that there is no vested constitutional or statutory rights in the continued practice of submarketing.[2]

There can be no doubt that the Commission's ruling had the effect of making the contract between Appellants and PSO unenforceable, but such did not violate Appellants' rights to due process, because, PSO, as a utility, was subject to the jurisdiction of the Corporation Commission at the time of the contract, and that the Commission, in the exercise of its jurisdiction, had the power to regulate the activities of PSO. Indeed, the contract entered into by the parties specifically provided that the agreement and services rendered thereunder shall in all respects be subject to the Rules, Regulations, and Orders of all Governmental Authorities having jurisdiction of the subject matter involved, and further subject to the Rules and Regulations of the Company (PSO) governing terms and conditions of service, now or hereafter in effect

---

1. See *Jonas v. Swetland Co.,* 119 Ohio St. 12, 162 N.E. 45 (1928); and *Sierra Pacific Power Company v. Nye,* 80 Nev. 88, 389 P.2d 387 (1964).

2. *Lewis v. Potomac Electric Power Co.,* 62 App. D.C. 63, 64 F.2d 701 (1933); *1010 Lincoln Place, Inc. v. Consolidated Edison Co. of New York, Inc.,* 190 Misc. 174, 73 N.Y.S.2d 2, 273 App.Div. 903, 77 N.Y.S.2d 168 (1947); *Campo Corporation v. Fineburg,* supra; *Sixty-seven South Munn, Inc. v. Bd. of Public Utilities Commission,* 106 N.J.L. 45, 147 A. 735 (1929).

and filed with the Corporation Commission of Oklahoma. The contract further provided that the amount to be paid to PSO was to be determined in accordance with an attached rate schedule, *until and unless such rate schedule is superseded by another applicable rate schedule either by order of the Corporation Commission of Oklahoma, or by means of a Standard Rate Change Endorsement executed by both parties.*

As the Commission had jurisdiction over the activities of PSO at the time the contract between PSO and Appellants was entered into, and as the contract before us indicates that the parties were aware of such jurisdiction, we cannot say that Appellants were deprived of any constitutional rights by virtue of the Commission's orders.[3] In *Campo, supra,* the Court, in reaching a like conclusion, found that whatever investment the landlords may have had tied up in their practice of submetering must be held to have been made at their own risk, because the practice of submarketing was always under the shadow of the regulatory powers which the Commission might exercise over the rates and classifications of public utilities.

The Commission has always had the power to regulate PSO's activities, and thus its Order, as it relates to PSO (there being no constitutional impairment), must be affirmed. In affirming the Commission's action, we would note that the practice of submetering may not be in the public interest, as the distributing agent (landlord) could be dishonest, use faulty metering, charge unfair rates, or provide an inadequate service, and yet be beyond the jurisdiction of any regulatory agency. Such possibilities fully justify the Corporation Commission's action in strictly supervising the sale of electric power by public utilities for resale. Under its regulatory authority, the Commission has the power to prohibit submarketing by prohibiting the sale of electricity for resale.[4] For the above stated

reasons, we hold that the Commission's refusal to grant Appellants an exception to the Commission's Order was constitutional, and that the Commission had the power and authority to do so by regulating the actions of PSO. We further hold that such action by the Commission was justified and we affirm the Commission's action insofar as it sought to regulate the activities of PSO.

### III.

■ However, the Order did more than seek to regulate the activities of PSO, for the Order directed Appellants to sell the electrical distribution system to PSO at an amount to be agreed upon by the parties, and if no agreement could be reached, to sell said facilities for an amount to be set by the Corporation Commission in accordance with the parties' contracts. Appellants argue that this direction to sell their facilities constitutes a confiscation of private property without due process of law and that the power exercised is beyond the jurisdiction of the Commission.

As we have previously held today, Appellants are not "public utilities" within the meaning of 17 O.S.1971, § 151. Therefore, the Corporation Commission lacks jurisdiction to order Appellants to sell their property. This being so, we need not address any constitutional challenge presented here. In short, we hold that the Commission lacked the authority to order the sale of the electrical distribution system. Thus, we reverse the action of the Corporation Commission insofar as it sought to compel Appellants to dispose of said equipment.

For the above stated reasons, we affirm the Order of the Corporation Commission insofar as it refused to allow PSO to sell electricity to the Appellants without complying with the provisions of Rule 11, but reverse the Commission's Order insofar as it attempted to require Appellants to sell their electrical distribution system to PSO.

3. See *Southern Union Gas Co. v. Texas County, etc.,* 564 P.2d 1004 (Okl.1977).

4. See *Ambassador, Inc. v. U.S.,* 325 U.S. 317, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945), in which the Supreme Court of the United States upheld the action by the FCC which stopped a hotel from surcharging guests for interstate or foreign long distance calls.

ORDER OF THE CORPORATION COMMISSION AFFIRMED IN PART AND REVERSED IN PART.

All the Justices concur.